UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

```
------------------------------------------------- x
                                                  :
YVONNE TYSON                                      :        3:09 CV 1736 (CSH)
                                                  :
V.                                                :
                                                  :
MICHAEL J. ASTRUE                                 :        DATE: JUNE 15, 2010
COMMISSIONER, SOCIAL SECURITY                     :
ADMINISTRATION                                    :
------------------------------------------------- x
```

RECOMMENDED RULING ON PLAINTIFF'S MOTION TO REVERSE OR REMAND THE
DECISION OF THE COMMISSIONER AND ON DEFENDANT'S MOTION FOR ORDER
AFFIRMING THE DECISION OF THE COMMISSIONER

This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. §§ 405(g)

and 1383(c)(3), as amended, seeks review of a final decision by the Commissioner of

Social Security denying plaintiff Supplemental Security Income ["SSI"] disability benefits.

I.  ADMINISTRATIVE PROCEEDINGS

On December 23, 2005, plaintiff Yvonne Tyson filed her application for DIB and

SSI, alleging an inability to perform substantial gainful activity since July 1, 1995[1] because

she suffers from severe congenital stenosis with degenerative disc disease of the cervical

and lumbar spine, depression and hypertension. (See Certified Transcript of

Administrative Proceedings, dated November 28, 2009 ["Tr."] 97-106; see also Tr. 46-48,

109-20). The Social Security Administration ["SSA"] denied plaintiff's claim both initially

and upon reconsideration. (See Tr. 52-58).[2]  On October 20, 2006, plaintiff requested a

_____

[1]At her hearing before ALJ Roy Liberman, plaintiff amended her onset date of disability to
July 1, 2004.  (Tr. 21).

[2]A claimant's work history is a prerequisite to a determination of eligibility for disability
benefits.  In order for a claimant to qualify for disability benefits, in addition to establishing
disability under the statute, a claimant must have "insured status."  20 C.F.R. § 404.130.  For
plaintiff to have disability insured status, plaintiff must satisfy the 20/40 Rule.  See 20 C.F.R. §
404.130(b).  The 20/40 Rule requires that plaintiff have at least 20 quarters of coverage in a 40

hearing before an Administrative Law Judge ["ALJ"], and on August 21, 2007, a hearing was held before ALJ Roy P. Liberman, at which plaintiff testified. (See Tr. 18-45, 55, 59-62, 65-66, 69-70, 73-74; see also Tr. 78-90). Plaintiff was represented by counsel at the hearing. (See Tr. 18, 49; see also Tr. 50–51, 63-64, 67-68, 71-72, 75-77, 92-96). On September 27, 2007, ALJ Liberman issued his decision denying plaintiff's claim. (See Tr. 7-19). On November 26, 2007, plaintiff requested review of ALJ Liberman's decision by the Appeals Council. (See Tr. 6). On August 14, 2009, the Appeals Council denied plaintiff's request for review, rendering ALJ Liberman's decision the final decision of the Commissioner. (See Tr. 1-4).

Plaintiff filed her Complaint on October 23, 2009 (Dkt. #3),[3] in response to which defendant filed his Answer on January 11, 2010. (Dkt. #8).[4] Thereafter, on March 16, 2010, plaintiff filed her Motion for Order Reversing the Decision of the Commissioner and brief in support. (Dkt. #13; see Dkts. ##11-12).[5] On April 16, 2010, defendant filed his Motion for Order Affirming the Decision of the Commissioner and brief in support. (Dkt. #14). On May 21, 2010, plaintiff filed her response to defendant's Motion to Affirm (Dkt. #18); on June 4, 2010, defendant filed his sur-reply brief. (Dkt. #21; see also Dkts.

---

quarter period ending with the quarter that she allegedly became disabled. See 20 C.F.R. § 404.130(b)(2). A "quarter" of coverage is the basic unit used by the SSA in determining whether a claimant has sufficient coverage under the Act to achieve insured status. See 20 C.F.R. § 404.140(a). An individual earns "quarters" based on the wages the person was paid during the period of three calendar months ending on March 31, June 30, September 30, or December 31 in any year. See 42 U.S.C. § 413(a)(1); 20 C.F.R. § 404.101(b). Plaintiff's application for DIB was denied because plaintiff does not have sufficient quarters of coverage to qualify; thus her application at issue in this action is for SSI benefits. (See Tr. 21-22; see generally Tr. 10, 107-08).

[3]Plaintiff commenced this action in forma pauperis on October 15, 2009 (Dkts. ##1-2).

[4]Attached to defendant's Answer is a certified copy of the transcript of the record, dated November 28, 2009. (Dkt. #8).

[5]Attached to plaintiff's brief (Dkt. #17) are copies of unpublished decisions.

##19-20). On January 12, 2010, Senior United States District Judge Charles S. Haight, Jr. referred this case to this Magistrate Judge.  (Dkt. #9).

For the reasons stated below, plaintiff's Motion for Order Reversing or Remanding the Decision of the Commissioner (Dkt. #13) is **granted in part and denied in part**; and defendant's Motion for Order Affirming the Decision of the Commissioner is (Dkt. #14) is **denied**.

## II. FACTUAL BACKGROUND

Plaintiff is fifty-seven years old (see Tr. 109, 169-74, 175-181); she is not married and she has five adult children. (See Tr. 23, 195).  Plaintiff graduated high school and then completed one year of college in 1970. (See Tr. 24-25, 119).  She also completed a culinary arts program in 2003. (See Tr. 119, 161).[6]

Plaintiff complains of back problems and tendinitis in the hip and knees. (See Tr. 114, 132, 204).  She also complains of a deteriorating spine, arthritis, and back pain which radiates down to her knees. (See Tr. 29).  Additionally, plaintiff reports that she suffers from insomnia and depression. (See Tr. 30-31).  According to plaintiff, she cannot stretch or bend, her ability to walk is limited, she is in pain all day, and she requires someone to help with her household chores.  (Tr. 114).[7]

Plaintiff reports that in a normal day, she "slowly get[s] into [the] motion of [her] daily routines" which include breakfast, lunch, and certain chores. (Tr. 144).  As a result of her physical condition, plaintiff claims she can no longer "[b]end, sleep comfortably,

---

[6]According to plaintiff, she was never given the chance to get culinary experience. (See Tr. 161).

[7]Plaintiff contends that she cannot get work as a companion or homemaker because she cannot "carry their grocery bags, t[]ake them for a walk, [or] clean flo[o]rs properly . . . ."  (Tr. 141).

walk [or] carry grocery bags." (Tr. 145).  At night, she tosses and turns until she can find a comfortable position. (See id.).  In addition, plaintiff claims that she has to dress sitting down and that sitting on the toilet starts a "pulling in [her] hip and buttocks."   (Id.). Plaintiff takes three muscle relaxants or painkillers, Ultracet, Methocarbamol, Cyclobenzaprine, and she takes Linisopril for her high blood pressure.   (Tr. 146).[8] Plaintiff does not need to be reminded to take her medications or to groom herself. (See Tr. 145).  She cooks once daily, but her physical condition has affected her ability to put a pot in the oven. (See Tr. 146).  She is able to do laundry, sweep, and dust, but cannot move furniture or "pick[] up certain objects." (Tr. 147).  Plaintiff leaves her apartment two-to-three times a week and uses public transportation as she does not have a driver's license.  (See Tr. 147).  She does not have difficulty paying her bills or handling her money. (See Tr. 148).  She watches television daily, and has not been able to bowl, run, or walk since her injury. (See id.).  According to plaintiff, she loved painting and bowling and was an outgoing person, and she used to "love doing factory work," however, all of that has changed. (See Tr. 151).   Plaintiff talks to others daily and does not need to be accompanied when she leaves the house, although her condition does prevent her from walking to her card games. (See Tr. 149).

According to plaintiff, her physical condition affects her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, and complete tasks. (Tr. 149). However, plaintiff also testified that she goes up and down five stairs at her apartment.  (Tr. 24). Plaintiff claims she can finish what she starts, except for chores; she is able to follow written instructions, although not spoken instructions; she can get along with others; and

---

[8]Additionally, plaintiff takes or has also taken Cymbalta for depression and Tramadol for pain.  (Tr. 139).

she can walk one or two corners before needing to stop. (See Tr. 150).  Plaintiff uses a walker and believes she is "alright" at handling stress and changes in her routine. (Id.).

Most recently, from February 2005 until December 2006, plaintiff worked for Interim Nursing Care where she washed dishes and took patients for walks. (See Tr. 153).[9]   Prior to that, from January 2002 until August 2002, plaintiff worked as an inspector at Guilford Gravure, where she would stand for twelve hours "put[ting] trays of stamp[s] into [a] machine" after inspecting the stamps.  (See Tr. 155; see also Tr. 26-27, 115; but see Tr. 153 (plaintiff reported she was employed from January to August 2004)). At this job she lifted between ten and twenty pounds. (Tr.  27, 115, 155).  From January until July 2002, plaintiff also worked as an inspector for the Postal Service.[10]  (See Tr. 154).  Prior to that she worked as an assembler in a factory for Schick from February until May 2001. (See Tr. 154; see also Tr. 26).  She had also been an assembler at a factory for Diversified Employment from 2000 until 2001 where she would lift boxes, no heavier than ten pounds, put them on pallets and pull them into other departments.  (See Tr. 154, 156).  From 1981 to 1986, plaintiff was a credit investigator for Ford Motor Company, where she obtained applications and accessed customer files; during the same time period, plaintiff was an office manager for Hill Health Center from 1979 or 1981 until 1986, where she maintained medical records; and she was a Dietary Aide for Yale-New

---

[9]Plaintiff's Summary of Earnings reveals earnings of $8,680.97 in 1987, and then minimal earnings over the next nine years: $57.50 in 1988, nothing in 1989-90, $55.25 in 1991, $102.48 in 1992, $230.58 in 1993, nothing in 1994, $627.25 in 1995, nothing in 1996, $40.00 in 1997, $236.50 in 1998, $1,162.40 in 1999, $3,453.97 in 2000, $2,979.10 in 2001, $5,913 in 2002, $32.00 in 2003, nothing in 2004, $593.08 in 2005, $264 in 2006, and nothing in 2007.  (Tr. 107).

[10]It appears that this work was also for Guilford Gravure and not specifically the Postal Service. (See Tr. 26-27, 115, 155).

Haven Hospital from 1976 until 1980, where she prepared menus and cleaned and sanitized work areas.  (See Tr. 153-54, 157-59).[11]

Plaintiff's medical records begin on March 31, 1992, when plaintiff appeared at the emergency room of Yale-New Haven Hospital after drinking and abusing cocaine.  (Tr. 255-58).  Plaintiff returned six months later, on September 15, 1992, at which time she was treated for acute alcoholism.  (See Tr. 251-54).

On December 5, 1997, plaintiff was treated at the emergency room at Yale-New Haven Hospital for pain in her left arm, neck and back, resulting from a fall on Thanksgiving.  (See Tr. 250).  She was diagnosed with musculoskeletal pain and was given Tradol. (Id.).

Plaintiff was seen at Hill Health Center in New Haven, Connecticut, on April 27, 1999, complaining of arm pain after a fall; her records reflect that five years earlier she had been to Hill Health Center for a clot in her left arm which had caused her "severe" pain.  (Tr. 231).   Plaintiff reported that her deltoid hurt and her left arm would also shake if she was holding an item, and the pain was worse when she slept. (Id.).  Plaintiff returned to Hill Health Center in early 2001 complaining of back pain and a sore throat. (See Tr. 230).

Plaintiff had an MRI of her cervical and thoracic spine performed on April 25, 2001, which revealed that "there [was] congenital spine stenosis in the cervical levels which [were] exacerbated by multiple small to moderate-sized disc-osteophyte

---

[11]Plaintiff also reports that she "had special training in certain areas where [she has been] discriminated especially with painting . . . [and] [i]n the culinary arts" where she was never given a chance to get experience.  (Tr. 161).

6

complexes."[12] (Tr. 246-47).  On June 25, 2001, plaintiff was treated at Hill Health Center for complaints of low back pain, which she rated as an "8" on a scale of 1-10.  (Tr. 229).  According to plaintiff, the pain was worse in the morning so that she "[could] hardly get out of bed."  (Id.).  Plaintiff was advised to apply heat to her back and get physical therapy at Yale.  (Id.).

On September 19, 2001, plaintiff had a bone density test to rule out osteoporosis. (See Tr. 244).  The test revealed that plaintiff had normal bone mineral density of the lumbar spine and femoral neck. (Id.).

On January 17, 2003, plaintiff was treated at Hill Health Center where she was advised to and expressed interest in seeking drug and alcohol counseling.  (Tr. 226-27). Fourteen days later, plaintiff underwent an EKG which yielded abnormal results.  (Tr. 226).  Plaintiff returned on March 19, 2003, at which time she was advised to stop drinking alcohol, and she was told that she would undergo a cardiac stress test after receiving abnormal EKG results.  (Tr. 223-24).  Plaintiff complained of low back pain radiating down her left leg, for which she was taking Ultracet.  (Tr. 223-35).

On March 27, 2003, plaintiff completed a cardiac stress test at Yale-New Haven Hospital. (See Tr. 215-20).  The study revealed abnormal ECG T-waves changes; plaintiff had normal global and regional left ventricular function and her blood pressure response was hypertensive.  (See Tr. 215-16; see also 219-20, 240-42, 261).  A month later, on April 22, 2003, plaintiff was seen at Hill Health Center where she was advised of the

---

[12]Plaintiff had a negative mammogram on March 16, 2000, April 18, 2000, and again on November 12, 2001. (See Tr. 243, 245, 248).  Plaintiff also had a gynecological ultrasound on February 1, 1999. (See Tr. 232, 249).

stress test results and referred to a nutritionist for a low fat, low cholesterol diet. (See Tr. 221-22).

Plaintiff was seen July 29, 2003 at Hill Health Center for a follow-up appointment relating to her hypertension, low back pain and alcohol and crack use. (See Tr. 212). Plaintiff complained of low back pain but could not elaborate other than to note that it made it difficult for her to work. (See id.). Plaintiff was advised to have an x-ray of her back. (Tr. 213). On December 9, 2003, plaintiff returned to Hill Health Center complaining of back pain extending to her legs; again an x-ray was recommended. (See Tr. 213-14).

Plaintiff was seen at Hill Health Center on May 4, 2004 for chronic low back pain and hypertension. (Tr. 173-74). Plaintiff reported pain extending down to her knees and noted that she had been off medication for a year "because [it] did nothing for the pain." (Tr. 174). Plaintiff admitted to using crack two days prior to the appointment. (See id.). Plaintiff was referred for an MRI of her lower back and was told to complete and submit disability forms. (See Tr. 173). Treatment for her substance abuse was also discussed and she was referred for a mammogram. (See id.).

On November 30, 2004, plaintiff went to the emergency room at Saint Raphael's Hospital complaining of shortness of breath and pain. (See Tr. 234-38). The pain had been sharp and constant for about twenty minutes the day before. (See Tr. 234). Plaintiff described the pain as a "10" on a scale from 0-10 and noted that it radiated from her right scapula down to her right elbow. (See Tr. 234-36). The pain had started the past week and plaintiff noted no known injury. (Tr. 236). Plaintiff was discharged with a diagnosis of right cervical radiculopathy. (Tr. 237).

8

Plaintiff was seen at Hill Health Center on January 3, 2005 for a PPD placement and a physical for employment. (See Tr. 171-72). It was noted that plaintiff was actively using cocaine and uninterested in detox. (See Tr. 171). Plaintiff returned to Hill Health Center on May 31, 2005. (See Tr. 169-70). It was noted that plaintiff had not taken any medication for her hypertension in several months and that she was seeking disability secondary to her back pain. (See id.). Plaintiff was advised that she should have an MRI. (See id.). On July 28, 2005, plaintiff rated her pain as a "2" on a pain scale from 0-10. (Tr. 168).

Plaintiff was seen at Saint Raphael's Hospital on November 12, 2005 following a motor vehicle accident. (See Tr. 175-79, 182-88). Plaintiff had been hit by a car while walking. (See Tr. 34).[13] Plaintiff complained of mild pain in her right arm, left hip and left ankle. (Tr. 182). There was no evidence of a fracture or dislocation in her ankle or hip. (See Tr. 175-76, 178). A radiology report of plaintiff's cervical spine revealed "[e]xtensive degenerative changes of the cervical spine with anterior osteophyte formation and slight decreased vertebral body height at C4, C5 and C6. Decreased disc spaces at C4/5, C5/6 C6/7." (Tr. 179).[14] The diagnostic impression was "[d]egenerative changes of the cervical spine without evidence of acute fracture dislocation." (Tr. 179).

Following the accident, plaintiff underwent chiropractic treatment under the care of Dr. Robinson. (See Tr. 189-94). At her first visit on November 21, 2005, plaintiff presented with low back pain, which had gotten progressively worse since the accident,

---

[13]The emergency room record reads, "[b]umped by slow moving car. [F]ell to ground. [Complains of right] arm pain." (Tr. 184).

[14]These scans were compared to ones taken on November 30, 2004 at St. Raphael's Hospital. (See Tr. 179, 180-81).

along with left hip pain, and left ankle pain. (<u>See</u> Tr. 189-90).  She also had "intermittent numbness and tingling" in her right arm, and she reported a history of bilateral hip pain that radiated into her legs to her knees. (Tr. 189).  Plaintiff was diagnosed with acute cervical strain/sprain with radiculitis into the right upper extremity; acute lumbar strain/sprain; paraspinal muscle spasms in the cervical and lumbar spine; acute exacerbation of left hip pain; and left ankle strain/sprain. (Tr. 189-90).

Plaintiff returned to the chiropractor on November 28, 2005, at which time her pain level and range of motion remained the same and she was treated with electric stimulation and manipulation. (Tr. 190).  Two days later, and again on December 2, 2005, plaintiff complained of neck and low back pain and her range of motion remained unchanged.  (<u>See id.</u>).  On December 5, 2005, plaintiff reported less pain in her neck and back, her ranges of motion were improved, although still painful at end range, and she had decreased tenderness over her cervical and lumbar paravertebral muscles. (<u>See</u> Tr. 191).   Plaintiff's pain continued to decrease during her December 7 and 14, 2005 visits. (<u>See</u> Tr. 191-92).

Plaintiff returned on December 15, 2005, during which appointment she continued to complain of cervical thoracic and lumbar pain and the examination findings remained unchanged. (<u>See</u> Tr. 192).  Again, there was no change when plaintiff was seen the next day. (<u>See id.</u>).  On December 19, 2005, plaintiff presented with slightly decreased pain and greater mobility; the doctor noted she was progressing. (<u>See id.</u>).  On December 21, 2005, Dr. Robinson noted that plaintiff was positive for Soto Hall's test for localized neck pain and positive for Kemp's test for localized low back pain. (<u>See</u> Tr. 193).   On December 23, 2005, plaintiff reported less pain throughout the day and improved

movement; Dr. Robinson again noted that plaintiff was improving as expected. (See id.). Plaintiff was seen again on January 17, 25, and 31, 2006; each time there was no change in plaintiff's pain or in the examination findings. (See Tr. 194).[15]  Plaintiff was last seen by Dr. Robinson on February 9, 2006, during which appointment plaintiff complained of pain in the neck and back as well as in her left hip. (See id.).

On March 8, 2006, Dr. Luis R. Cruz completed a Consultative Examination Report for Connecticut Disability Determination Services ["DDS"]. (See Tr. 195-96).   Dr. Cruz noted that plaintiff complained of "pain in both shoulders radiating to the upper extremities and associated with numbness and tingling sensation," as well as "chronic lower back pain radiating to the left lower extremity" which was aggravated by her motor vehicle accident in November 2005. (Tr. 195).  He also noted that plaintiff was on Ultracet and Linisopril and had a history of hypertension. (Id.). Plaintiff admitted that she stopped smoking two months prior, and she drinks alcohol and uses cocaine. (Id.).  Dr. Cruz noted that plaintiff did not appear in acute distress, was alert, had a normal gait, and was able to get on and off the examining table without difficulty. (Id.).  Plaintiff's ranges of motion were normal although she did complain of radiating pain "from the lower back to the posterior aspect of the left leg."  (Tr. 196).  Dr. Cruz's impression was as follows: chronic pain in both shoulders and the lower back; probably sciatica; history of hypertension; and alcohol and cocaine abuse. (Id.).

On March 22, 2006, Dr. Derrick Bailey completed a Physical Residual Functional Capacity Assessment of plaintiff for SSA. (See Tr. 197-204).  Dr. Bailey noted that plaintiff could occasionally lift fifty pounds, could frequently lift twenty-five pounds, could stand or

---

[15]Plaintiff noted decreased pain when seen on January 18, 2005. (Tr. 193).  The January 17, 2006 visit and the January 31, 2006 visit were with Dr. Corrigan.  (See Tr. 193-94).

walk about six hours in an eight hour day, could sit for six hours in an eight hour day, and was not limited in her ability to push or pull. (Tr. 198).  Dr. Bailey noted no postural, manipulative, visual, communicative, or environmental limitations. (See Tr. 197-204).   On this same date, Natalie Harbeson completed a vocational assessment of plaintiff for DDS in which she noted that plaintiff had the RFC assessment for medium level exertion as she could lift up to fifty pounds occasionally and twenty-five pounds frequently, and could stand, walk or sit for six hours in the workday.  (Tr. 121).  According to Harbeson, plaintiff could perform work as a packager, small parts assembler or cafeteria worker. (Id.).

On March 30, 2006, plaintiff returned to the Hill Health Center complaining of pain on the left side of her body.  (See Tr. 205-06).  Plaintiff noted that the Ultracet was "not particularly helpful" and that she was "seeking disability." (Tr. 206).  She also mentioned that she had been in a car accident and was seeing a chiropractor, though her low back pain preceded the car accident. (Id.).

On August 14, 2006, plaintiff had an MRI of her spine which revealed congenital cervical stenosis with degenerative disk disease, congenital lumbar stenosis with degenerative disk disease, L5/S1 left paracentral extrusion, and a left narrowing of the spinal canal and left neural foramen.  (Tr. 239; see also Tr. 260).  Two weeks later, on August 29, 2006, R.P. Savage of SSA completed a Report of Contact in which he recommended an "affirmation" of the denial of plaintiff's benefits.  (Tr. 132).

On August 21, 2007, a hearing was held before ALJ Roy P. Liberman at which plaintiff testified.  (See Tr. 18-45).  According to plaintiff, most of her work experience entailed factory work, where she was pulling and hauling packages; at most of these jobs

she was sitting on a bench during the duration of her shift. (See Tr. 25).  Plaintiff claims she has "pain that shoots through [her] from [her]. . . spine down to [her] legs . . ." as a result of a "deteriorating spine." (Tr. 28-29).  The pain radiates down to her knees. (See Tr. 29, 33).  Plaintiff takes medications for tendinitis, arthritis, and back pain. (Tr. 29). Plaintiff testified that she is treated for this pain at Hill Health Center, previously by Patricia Decker, and now by a Dr. Earlington. (Tr. 29).  The pain is constant and helped for "just a few minutes" by prescribed medication. (Tr. 33).  Plaintiff can walk without a cane, but only "really, really" slowly and with "little paces;" she can walk with the cane for a block which takes about twenty minutes. (Tr. 41).  Plaintiff underwent physical therapy for "[m]aybe about six months," but that did not help. (Tr. 32).  According to plaintiff, her pain increased in November 2005, after she was hit by a motor vehicle when she was walking.[16] (Tr. 34).

Plaintiff also claims that she suffers from depression and insomnia, which ailments are also being treated at Hill Health Center. (Tr. 30-31).  Plaintiff claims she is on medications, including Seroquel, that help her sleep but they do not help her depression. (Id.; Tr. 38).  In addition, plaintiff testified that she cries often, just from certain thoughts or being tired; her "crying spells" are "automatic" and do not last long. (Tr. 38-39). According to plaintiff she may "go to bed about 9:00, 10:00 at night," and then "sleep until 12:00 and then [she is] up until about 3:00 and then [she will] sleep [from] 3:00 to

---

[16]In her Disability Report-Appeal form, plaintiff noted that her condition was getting worse and that she was in pain all the time; the onset of the increased pain was January 2006. (See Tr. 122-28).

4:00 and then [she is] up the rest of the day . . . ." (Tr. 31).  Plaintiff claims both the insomnia and depression are caused by her physical pain.  (Id.).[17]

Plaintiff testified that she does not leave the house, except to go to her mother's house. (Tr. 32).  However, she used to be extremely active. (Tr. 40).  She has a friend who comes over to help her cook, does the shopping, and goes to the laundromat. (Tr. 32).  If she needs to leave her house, her daughter will pick her up. (Tr. 32, 39-40).  Plaintiff says she needs the help of her friend because she does not go out much and could not even pick up a five pound bag of sugar. (Tr. 32).  According to plaintiff, she spends most of her time watching television and lying down; she does not stand often and only uses one dish when she eats because she cannot spend time on her feet washing more than the one dish. (Tr. 35).  Plaintiff testified that on a bad day she simply sits on the couch all day and this occurs three-to-four times per week. (Tr. 42-43).  She does not know what activates the pain; "it [is] just there." (Tr. 43).

## III.  STANDARD OF REVIEW

The scope of review of a Social Security disability determination involves two levels of inquiry.  First, the court must decide whether the Commissioner applied the correct legal principles in making the determination.  Second, the court must decide whether the determination is supported by substantial evidence.  See Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998)(citation omitted).  Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla."  Richardson v. Perales, 402 U.S. 389, 401 (1971)(citation omitted); see Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998)(citation omitted).  The substantial

---

[17]According to plaintiff she has not had any drug or alcohol problems in "probably over five, seven years." (Tr. 30).

14

evidence rule also applies to inferences and conclusions that are drawn from findings of fact.  See Gonzalez v. Apfel, 23 F. Supp.2d 179, 189 (D. Conn. 1998)(citation omitted); Rodriguez v. Califano, 431 F. Supp. 421, 423 (S.D.N.Y. 1977)(citations omitted). However, the court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner.  See Dotson v. Shalala, 1 F.3d 571, 577 (7th Cir. 1993)(citation omitted).  Instead, the court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings.  See id.  Furthermore, the Commissioner's findings are conclusive if supported by substantial evidence and should be upheld even in those cases where the reviewing court might have found otherwise.  See 42 U.S.C. § 405(g); see also Beauvoir v. Charter, 104 F.3d 1432, 1433 (2d Cir. 1997)(citation omitted).

Under the Social Security Act, every individual who is under a disability is entitled to disability insurance benefits.  See  42 U.S.C. § 423(a)(1).  "Disability" is defined as an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1).

Determining whether a claimant is disabled requires a five-step process.  See 20 C.F.R. § 404.1520.  First, the ALJ must determine whether the claimant is currently working.  See 20 C.F.R. § 404.1520(a).  If the claimant is currently employed, the claim is denied.  See  20 C.F.R. § 404.1520(b).  If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is also denied.  See 20 C.F.R. § 404.1520(c).  If the claimant is found to have a severe impairment, the third step is to compare the claimant's

impairment with those in Appendix 1 of the Regulations [the "Listings"].  See 20 C.F.R. § 404.1520(d); Bowen v. Yuckert, 482 U.S. 137, 141 (1987); Balsamo, 142 F.3d at 79-80. If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled.  See 20 C.F.R. § 404.1520(d); see also Balsamo, 142 F.3d at 80.  If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, he will have to show that he cannot perform his former work.  See 20 C.F.R. § 404.1520(e).  If the claimant shows he cannot perform his former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work.   See Balsamo, 142 F.3d at 80 (citations omitted). Accordingly, a claimant is entitled to receive disability benefits only if he shows he cannot perform his former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment.   See 20 C.F.R. § 404.1520(f); see also Balsamo, 142 F.3d at 80 (citations omitted).

The Commissioner may show a claimant's Residual Functional Capacity ["RFC"] by using guidelines ["the Grid"].   The Grid places claimants with severe exertional impairments, who can no longer perform past work, into employment categories according to their physical strength, age, education, and work experience; the Grid is used to dictate a conclusion of disabled or not disabled.   See 20 C.F.R. § 416.945(a)(defining "residual functional capacity" as the level of work a claimant is still able to do despite his or her physical or mental limitations).  A proper application of the Grid makes vocational testing unnecessary.

However, the Grid covers only exertional impairments; nonexertional impairments, including psychiatric disorders, are not covered.  See 20 C.F.R. § 200.00(e)(2).  If the

Grid cannot be used, i.e., when nonexertional impairments are present or when exertional impairments do not fit squarely within Grid categories, the testimony of a vocational expert is generally required to support a finding that employment exists in the national economy which the claimant could perform based on his residual functional capacity.  See Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996)(citing Bapp v. Bowen, 802 F.2d 601, 604-05 (2d Cir. 1986)).

## IV.  DISCUSSION

Following the five step evaluation process, ALJ Liberman found that plaintiff has not engaged in any substantial gainful activity since December 23, 2005, the date of her application for SSI benefits.  (Tr. 12; see 20 C.F.R. § 404.1520(a) & (b)).  ALJ Liberman then concluded that the medical evidence supports a finding that the claimant has the following severe combination of impairments: congenital stenosis with degenerative disc disease of the cervical and lumbar spines, and hypertension (Id. at 12-13; see 20 C.F.R. § 404.1520(c)); however, in the third step of the evaluation process, ALJ Liberman concluded that plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix I.  (Tr. 13; see 20 C.F.R. §§ 416.920(d), 416.925 & 416.926)).  In addition, at step four, the ALJ found that after careful consideration of the entire record, plaintiff has the RFC to perform the full range of medium work.[18] (Tr. 13-16).  Further, ALJ Liberman concluded that given plaintiff's age, education, work experience and RFC, there are jobs

---

[18]20 C.F.R. § 404.1567(c) and 20 C.F.R. § 416.967(c) read: "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  If someone can do medium work, we determine that he or she can also do sedentary and light work."

that exist in significant numbers in the national economy that plaintiff can perform.  (Tr. 16-17).

Plaintiff seeks an order reversing or remanding the decision of the Commissioner. (See Dkt. #13).  According to plaintiff, the ALJ erred in finding that plaintiff has an RFC for the full range of medium work, as the ALJ afforded great weight to the opinion of a non-examining medical expert; the ALJ erred in his assessment of plaintiff's credibility; and the ALJ erred by failing to follow the requirements of defendant's own rules and regulations for determining whether plaintiff's use of alcohol or drugs was a material factor contributing to a finding of disability.  (Dkt. #13, Brief, at 11-25; see also Dkt. #18, at 2-7).   The Commissioner counters that ALJ Liberman properly assessed plaintiff's credibility and made specific findings supported by substantial evidence; and the ALJ properly assessed the record medical opinions. (Dkt. #14, Brief, at 13-21; see also Dkt. #21, at 1-2).

A. RFC DETERMINATION AND ASSESSMENT OF RECORD MEDICAL OPINIONS

Plaintiff contends that there is not substantial evidence to support the ALJ's finding that plaintiff has the RFC for the full range of medium work.  (Dkt. #13, Brief, at 12-16).  Specifically, plaintiff contends that the ALJ "impliedly rejected" the evidence that plaintiff pursued medical treatment for her lower back pain since 2001 and that the pain worsened after she was struck by a car in 2005; and the only medical evidence in the record supporting the ALJ's conclusion is by Dr. Bailey, a non-examining doctor, and Dr. Bailey's assessment is not supported by substantial evidence and is based on incomplete medical records, or is based on his failure to completely review all the medical records. (Id. at 13-16).  The Commissioner counters that the ALJ "clearly incorporates treatment

notes and test results from treating medical professionals"; Dr. Bailey's findings explicitly reflect contemplation and assessment of the record; and the ALJ indicated the weight afforded to Dr. Cruz's findings in his conclusion that there is "nothing in the record" to contradict the state agency physicians' view that plaintiff is capable of medium work. (Dkt. #14, Brief, at 18-21).

The RFC is the most of what an individual can still do despite his or her limitations.   SSR 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996); 20 C.F.R. § 404.1545(a)(1).   "Ordinarily, RFC is the individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis[,]" and the RFC assessment must include a discussion of the individual's abilities on that basis.[19] SSR 96-8p, at *1.   In this case, the ALJ concluded that plaintiff is capable of performing the full range of medium exertion work.[20]   (Tr. 14, 17).   In reaching his conclusion, the ALJ relied on the state agency physicians' conclusions, noting that "[t]here is nothing in the record to contradict this view."   (Tr. 14).

"State agency medical and psychological consultants . . . are highly qualified physicians and psychologists who are also experts in Social Security disability evaluation." 20 C.F.R. § 404.1527(f)(2)(I).   As the Second Circuit has held, the opinions of non-examining sources can override the treating sources' opinions provided they are supported by evidence in the record.  Schisler v. Sullivan, 3 F.3d 563, 567 (2d Cir. 1993). In this case, the RFC determination was made by a state agency physician, Dr. Derrick Bailey, who relied on plaintiff's medical records and the Consultative Examination Report

---

[19]"A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."  Id.

[20]See note 18 supra.

of Dr. Cruz.  (See Tr. 204).  In relying on Dr. Bailey's determination, the ALJ did not override a treating source's opinion as no treating physicians assessed plaintiff's functional limitations.  (Tr. 14).  In his Consultative Examination Report, Dr. Cruz noted that plaintiff complained of "pain in both shoulders radiating to the upper extremities and associated with numbness and [a] tingling sensation," as well as "chronic lower back pain radiating to the left lower extremity"; however, Dr. Cruz also noted that plaintiff did not appear in acute distress, she had a normal gait, and she was able to get on and off the examining table without difficulty. (Tr. 195).   He also noted that plaintiff's ranges of motion were normal, although she did complain of radiating pain "from the lower back to the posterior aspect of the left leg."  (Tr. 196).  After noting plaintiff's chiropractic care in late 2005, her restricted and painful lumbar and cervical ranges of motions in November 2005, and her lumbar and left hip tenderness in February 2006, Dr. Bailey noted that as of Dr. Cruz's examination on March 8, 2006, while plaintiff had complaints of pain on forward flexion of both hips, her range of motion was normal as was her fine and gross manipulation.  (Tr. 204).  Based on the foregoing, Dr. Bailey concluded that plaintiff could occasionally lift fifty pounds, could frequently lift twenty-five pounds, could stand or walk about six hours in an eight hour day, could sit for six hours in an eight hour day, and was not limited in her ability to push or pull. (Tr. 198).  As plaintiff accurately observes, none of the records cited by Dr. Bailey support the conclusion that plaintiff can lift, carry, stand and sit at the levels discussed above.

Additionally, plaintiff contends that Dr. Bailey ignored the MRI images that revealed congenital cervical stenosis with degenerative disk disease, congenital lumbar stenosis with degenerative disk disease, L5/S1 left paracentral extrusion, and left

narrowing of the spinal canal and left neural foramen, as Dr. Bailey noted that plaintiff had been referred for an MRI but there are no records of such in the record.  (Dkt. #13, Brief, at 15; Tr. 204).  The MRI to which plaintiff refers was taken after Dr. Bailey issued his findings on March 22, 2006; the MRI was taken on August 14, 2006.  (Compare Tr. 204 with Tr. 239).  Through no fault of his own, Dr. Bailey did not have the benefit of a complete medical file as that MRI did not yet exist.  Defendant contends that the absence of the MRI from the record at the time of the state agency assessment "does not overturn the substantial evidence supporting the ALJ's decision[,]" as there is an absence of evidence that her condition worsened in the short time between the state agency assessments and the MRI.  (Dkt. #14, Brief, at 20).  This Court disagrees.

Plaintiff underwent an x-ray of her cervical spine following her November 2005 accident, which radiological report revealed "[e]xtensive degenerative changes of the cervical spine with anterior osteophyte formation and slight decreased vertebral body height at C4, C5 and C6. Decreased disc spaces at C4/5, C5/6 C6/7" and "[d]egenerative changes of the cervical spine without evidence of acute fracture dislocation."  (Tr. 179). Between that report and her 2006 MRI, plaintiff underwent chiropractic treatment and was treated at Hill Health Center for pain in the left side of her body. In addition to failing to provide any support for his RFC determination, since the medical records he does reference do not serve to support his conclusions regarding plaintiff's ability to lift, carry, stand and sit, Dr. Bailey also does not reference the first report and did not benefit from having the second MRI to review.  Before a determination is made of a claimant's residual functional capacity, "all of the relevant medical and other evidence" must be considered, and defendant is "responsible for developing a complete medical history . . ." from which

a conclusion is reached.   20 C.F.R. § 416.945(a)(3).   Dr. Bailey's functional capacity assessment, upon which the ALJ relied, is not supported by substantial evidence in the record as it is based on references to limited medical records, and plaintiff's objective radiological reports were not considered.[21]

### B. EVALUATION OF PLAINTIFF'S CREDIBILITY

According to plaintiff, the ALJ erred in his credibility determination as his findings are not "sufficiently specific"; the ALJ's conclusion that plaintiff has failed to seek ongoing treatment is based on clear gaps in the administrative record which the ALJ had a duty to fill; the ALJ's statement that the "claimant's work history has been minimal in the past 15 years" is not explained or supported; the ALJ's reference to plaintiff's "long history of substance abuse as early as September 1992" is not supported by the record, and thus, the ALJ's reliance thereon is in error; the ALJ's statement that there is a lack of objective evidence documenting significant clinical or laboratory findings is "simply wrong," and the ALJ's statement that there were inconsistencies in plaintiff's reports of limitations is not supported by substantial evidence.  (Dkt. #13, Brief, at 17-24; see also Dkt. #18, at 3-7).  The Commissioner counters that the ALJ set forth several reasons for disbelieving plaintiff's allegations of disabling pain; he specifically noted objective medical evidence that supported his conclusion that plaintiff does not suffer from a disabling condition; and he specifically noted inconsistencies in plaintiff's complaints, her failure to seek ongoing treatment, her minimal work history, and her history of drug and alcohol abuse.  (Dkt. #14, Brief, at 13-18).

---

[21]The Commissioner recognizes that an RFC assessment is made by a state agency physician, and "it is the physician's obligation to review the entire record and generate RFC findings with citations to the record."  (Dkt. #14, Brief, at 20, citing 20 C.F.R. § 416.946(a)).  Clearly this did not happen in this case.  (See Tr. 204).

When assessing a claimant's credibility, an ALJ must consider the entire case record, including objective medical evidence, the individual's statements about her symptoms and the impact of her pain on her ability to work, her treatment and the statements of her treating or examining physicians about how the symptoms affect the individual, the individual's daily activities, medications, location, duration, frequency and intensity of pain, the precipitating or aggravating factors, and the measures the individual takes to relieve pain.  See 20 C.F.R. § 416.929(c)(1)-(3); see SSR 96-7p, 1996 WL 374186, at *1 (S.S.A. July 2, 1996).  An ALJ may discount a claimant's subjective testimony with respect to the degree of impairment afer weighing inconsistencies in such testimony and the objective medical evidence. See Burrows v. Barnhart, Civ. No. 3:03 CV 342 (CFD)(TPS), 2007 WL 708627, at *11-12 (D. Conn. Feb. 20, 2007)(citations omitted). A strong indication of the credibility of a claimant's statements is their consistency, both internally and with other information in the case record.  See SSR 96-7p, at *5; see Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979).  An ALJ must compare a claimant's statements made in connection with her claim with statements she made under other circumstances that are in the case record, and statements a claimant made to treating and examining medical sources are especially important.  See SSR 96-7p, at *5.  If the ALJ does discredit a plaintiff's testimony, he must do so with sufficient specificity.  SSR 96-7p, at *4; see Williams ex rel. Williams v. Bowen, 859 F.2d 255, 261 (2d Cir. 1988)(citation omitted); Romano v. Apfel, No. 99 Civ. 2689 LMM, 2001 WL 199412, at *6 (S.D.N.Y. Feb. 28, 2001)(citation omitted).

"It has been established, both in this Circuit and elsewhere, that subjective pain may serve as the basis for establishing disability, even if such pain is unaccompanied by

positive clinical findings or other 'objective' medical evidence," but in order to reach such conclusion, there must be a some medically ascertained impairment. Marcus, 615 F.2d at 27 (emphasis in original)(multiple citations omitted); Gallagher v. Schweiker, 697 F.2d 82, 84 (2d Cir. 1983)(citations omitted).[22]   While an ALJ is free to make a credibility determination, an ALJ "cannot arbitrarily substitute his own judgment for competent medical evidence." McBrayer v. Sec'y of Health & Human Servs., 712 F.2d 795, 799 (2d Cir.1983)(citation omitted).

ALJ Liberman concluded that while plaintiff's "medically determinable impairments could reasonably be expected to produce the alleged symptoms, . . . [plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible."  (Tr. 14).  However, contrary to the plaintiff's assertion, the ALJ's conclusion did not end here; he went on to precisely state the reasons for his credibility determination.  (See Tr. 14-16).  Specifically, the ALJ noted that plaintiff has failed to seek ongoing treatment; plaintiff has a minimal work history in the last fifteen years; plaintiff has a "drug history"; there is a lack of objective evidence documenting significant functional deficits; and plaintiff's subjective complaints of pain of such intensity to prevent her from engaging in all work activities are not supported by her treatment notes.  (See id.).

---

[22]In Gallagher, the Second Circuit went on the explain the rationale for this high standard:

Manifestly the [Social Security] Act ties the scope of its benefits to the progress of medical science, permitting a denial of benefits in those instances when the cause of subjective symptoms defies diagnosis.  Congress was entitled to conclude that in the allocation of trust funds medical ascertainment of the existence of an abnormality was an appropriate safeguard against the risk of payment for exaggerate claims of subjective pain, even though such a requirement permits denial of payment to some undiagnosed claimants who may truly be in distress.

697 F.2d at 85.

## 1. FAILURE TO SEEK ONGOING TREATMENT

During plaintiff's hearing before ALJ Liberman, her counsel told the ALJ that he has been waiting for prescription and treatment records from the Hill Health Center for a visit about three months ago, in response to which the ALJ stated, "I'm going to review the record and see if I have enough.  If I don't[,] I'll let you know."  (Tr. 36-37). Additionally, at the hearing, plaintiff testified that her doctors at Hill Health Center suggested that she should have back surgery but because the doctors changed at Hill Health Center so often, she has not received consistent advice.  (Tr. 31).  Plaintiff also testified that she was referred to a back specialist and that she had an appointment scheduled for August 28, 2007 - seven days after the hearing.  (Id.).  At the conclusion of the hearing, the ALJ repeated that if he needed anything else, he would let plaintiff's counsel know.  (Tr. 45).  Where there are "obvious gaps in the administrative record," thereby depriving the ALJ of a complete medical history, the ALJ has a duty to "fill [such] clear gaps in the record."  Rosa v. Callahan, 168 F.3d 72, 79 & n.5 (2d Cir. 1999)(multiple citations omitted).  However, rather than request these missing records, the ALJ relied on the absence of these treatment records as evidence of plaintiff's failure to seek ongoing treatment, which evidence weighed in favor of his negative credibility determination. (See Tr. 15-16).[23]

---

[23]The ALJ stated that the "record fails to indicate the claimant has received any treatment for her back other than chiropractic," the "record documents minimal treatment and no evidence of a referral for specialized treatment," and "to date[,] records [of her appointment with a back specialist] have not been submitted to corroborate this treatment."  (Tr. 15).

In addition to the foregoing, plaintiff contends that the ALJ's statement that there is a lack of objective evidence documenting significant clinical or laboratory findings is "simply wrong." (Dkt. #13, Brief, at 23). As discussed above, while there may not be a plethora of treatment notes, there are objective findings of plaintiff's back impairment, namely, the 2006 MRI, the radiology report taken following her accident, and records from fourteen visits for chiropractic care. (See 179, 189-94, 239).

25

### 2. MINIMAL WORK HISTORY

In his decision, ALJ Liberman noted that the "claimant's credibility is affected by her . . . minimal work history," which statement plaintiff contends is erroneous as, "[w]hile it may be true that the [p]laintiff had minimal earnings since 1986, the ALJ's conclusion that the [p]laintiff had a 'minimal work history' is not supported by substantial evidence." (Dkt. #13, Brief, at 22).   Plaintiff's work history is recited above and it does reflect a lack of substantial work from 1986 until 2000 or 2002.[24]   (See Tr. 153-56; see also Dkt. #19, Brief at 2).   The ALJ did not err in calling plaintiff's work history "minimal," and at the conclusion of his reference to plaintiff's work, he used the same phrase with which plaintiff agrees - - "the record indicates the claimant has . . . had minimal earnings in the last [fifteen] years."   (Tr. 16).

### 3. HISTORY OF SUBSTANCE ABUSE

In his decision, ALJ Liberman accurately noted that the record documents a "history of alcohol and cocaine abuse," and that plaintiff's "credibility as to her abstinence from drugs/alcohol for the past [five to seven] years is questionable, as the record shows continued substance abuse at least through March 2006."   (Tr. 12).[25]   In March 2006, plaintiff admitted to Dr. Cruz that she drank alcohol and used cocaine (see Tr. 195), and a year prior, in January 2005, plaintiff was using cocaine and was "uninterested in detox." (Tr. 171).   At minimum, these two entries contradict plaintiff's testimony and contradict plaintiff's assertion in her brief that other than the September 1992 Yale-New Haven

---

[24]See note 9 supra.

[25]Plaintiff correctly clarifies that plaintiff testified in response to the question: "have you had any problems with alcohol or drugs?," to which plaintiff responded, "I haven't had no problems with – its probably over five, seven years." (Tr. 30)(emphasis added).

Hospital record evidencing treatment for acute alcoholism, "[t]here are no other records that document any type of substance abuse, treatment, or detoxification." (Dkt. #13, Brief, at 22).[26]

Further, although plaintiff contends that there is no history of drug or alcohol addiction, she also argues that the ALJ did not address whether plaintiff's alleged drug abuse is a contributing factor material to a finding of disability.  20 C.F.R. § 404.1535(a); (see Dkt. #13, Brief, at 23).  In order for the ALJ to address whether a drug addiction or alcoholism is a contributing factor material to making a determination of disability, the ALJ must first find the claimant disabled, and then must determine whether the claimant would still be disabled if she stopped using drugs or alcohol. 20 C.F.R. § 416.935(a)-(b). In this case, the ALJ concluded that plaintiff is not disabled and thus he did not address whether plaintiff's drug and alcohol use rose to a drug and alcohol addiction that may be a contributing factor material to the determination of disability.

### 4. INCONSISTENCIES IN REPORTS ON LIMITATIONS & LACK OF OBJECTIVE EVIDENCE

The ALJ noted in his decision that plaintiff's testimony and reports of her activities of daily living are inconsistent, and her testimony regarding side effects from her medications and the use of a cane for ambulation are not supported by the objective medical records.  (Tr. 16).  A review of the administrative transcript reveals that plaintiff's testimony does not differ greatly from her earlier reports of her daily activities.   She

---

[26]In addition to the September 1992 entry, the January 2005 entry and the  March 2006 entry, plaintiff's medical records also include the following references: in January 2003, plaintiff, while being treated at Hill Health Center, was advised to and expressed an interest in seeking drug and alcohol testing (Tr. 226-27); in July 2003, when plaintiff was seen at Hill Health Center for a follow-up appointment, she noted alcohol and crack use (Tr. 212); and in May 2004, treatment for her substance abuse was again discussed during her appointment at Hill Health Center (Tr. 173).

reported that her normal day includes certain chores, that she can do her laundry, sweep and dust, but she cannot move furniture or "pick[] up certain objects," and that she needs some help with her household chores.  (Tr. 114, 144, 147).  Specifically, plaintiff claims that she can no longer "[b]end, sleep comfortably, walk [or] carry grocery bags[,]" (Tr. 145), and she cannot get work as a companion or homemaker because she cannot "carry . . . grocery bags, t[]ake [the clients] for a walk, [or] clean flo[o]rs properly."  (Tr. 141).   Consistent with her reported difficulties lifting and being on her feet, plaintiff testified that her friend comes over to help her cook because she could not even pick up a five pound bag of sugar, and she cannot spend more time on her feet than it takes her to wash one dish.  (Tr. 32, 35).  Additionally, though the ALJ correctly noted there is no prescription for a cane in her records, at the time she reported her condition to SSA, she noted use of a walker (see Tr. 150), which is consistent with her use of a cane at the time of the hearing.  (Tr. 41).   Furthermore, as they are discussed above, the existence of objective medical records weighs in favor of plaintiff's complaints relating to her impairments.

As the Second Circuit has made clear, "[c]redibility findings of an ALJ are entitled to great deference and therefore can be reversed only if they are 'patently unreasonable.'" Pietrunti v. Dir., Office of Workers' Comp., 119 F.3d 1035, 1042 (2d Cir. 1997), quoting Lennon v. Waterfront Transport, 20 F.3d 658, 661 (5th Cir. 1994).  Standing alone, the purported "inconsistencies" do not exist as an independent basis for finding plaintiff not credible. However, taken as a whole, the ALJ's credibility determination is not "patently unreasonable."  That said, for the reasons stated above, the ALJ's finding regarding the absence of treatment records and the effect on plaintiff's

credibility is not supported by the substantial evidence of record.  Furthermore, for the reasons stated in Section IV.A. supra, this matter is remanded pursuant to sentence four of 42 U.S.C. § 405(g)[27] to the ALJ for further proceedings, during which a thorough RFC assessment and credibility determination will be made with the benefit of plaintiff's entire medical record.

## V. CONCLUSION

For the reasons stated below, plaintiff's Motion for Order Reversing or Remanding the Decision of the Commissioner (Dkt. #13) is **granted in part and denied in part**; and defendant's Motion for Order Affirming the Decision of the Commissioner is (Dkt. #14) is **denied**.

The parties are free to seek the district judge's review of this recommended ruling.  See 28 U.S.C. §636(b)**(written objection to ruling must be filed within fourteen days after service of same)**; FED. R. CIV. P. 6(a), 6(e), & 72; Rule 72.2 of the Local Rule for United States Magistrate Judges, United States District Court for the District of Connecticut; Small v. Secretary of HHS, 892 F.2d 15, 16 (2d Cir. 1989)**(failure to file timely objection to Magistrate Judge's recommended ruling may preclude further appeal to Second Circuit)**.

---

[27]42 U.S.C. 405(g) empowers the Court with the ability to

at any time order additional evidence to be taken before the Commissioner of Social Security . . .; and the Commissioner of Social Security shall, after the case is remanded, and after hearing such additional evidence if so ordered, modify or affirm the Commissioner's findings of fact or the Commissioner's decision, or both, and shall file with the court any such additional and modified findings of fact and decision, and, in any case in which the Commission has not made a decision fully favorable to the individual, a transcript of the additional record and testimony upon which the Commissioner's action in modifying or affirming was based.

Dated this 15th day of June, 2010 at New Haven, Connecticut.


  /s/ Joan G. Margolis, USMJ
Joan Glazer Margolis
United States Magistrate Judge